Date signed March 29, 2013



**WENDELIN I. LIPP**
**U. S. BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| Stephen Sieber, | * | Case No. 07-21192-WIL |
| | | Chapter 7 |
| Debtor. | * | |
| * * * * * * * | | |
| United States Trustee, | * | |
| Plaintiff, | * | |
| v. | * | Adv. Proc. 10-00567 |
| Stephen Sieber | * | |
| Defendant. | * | |
| * * * * * * * * * * * * * | | |

## <u>MEMORANDUM OF DECISION</u>

Before the Court is the United States Trustee's Complaint to Deny Discharge of Debtor (the "Complaint") and the Defendant's Answer thereto. The Court held a two-day trial on October 11-12, 2011, at the conclusion of which the parties were permitted to file post-trial briefs. The Court has considered the pleadings filed by the parties, the oral arguments and

testimony given at trial, and the exhibits admitted into evidence.[1]  For the following reasons, the

Court finds in favor of the Plaintiff and the Defendant shall be denied a discharge pursuant to 11

U.S.C. §§ 727(a)(2),(3) and (4).

## I.    Findings of Fact

The following facts are relevant to the Court's determination and are either undisputed or

supported by the evidence presented at trial.[2]  On November 7, 2007, Stephen C. Sieber (the

"Debtor" or "Defendant") filed a petition under Chapter 11 of the United States Bankruptcy Code

with the assistance of counsel.  Also on November 7, 2007, the Debtor filed bankruptcy Schedules

and a Statement of Financial Affairs, both of which were signed by the Debtor under penalty of

perjury as to their accuracy.  On November 27, 2007, the Court approved the Debtor's application

to employ attorney Keith Havens ("Attorney Havens") as counsel.  On March 25, 2008, the United

States Trustee filed a Motion to Dismiss or Convert the Debtor's bankruptcy case to a case under

Chapter 7 of the Bankruptcy Code (the "Motion to Dismiss or Convert").  The Motion to Dismiss

or Convert cites, among other things, the Debtor's failure to file timely and complete Monthly

Operating Reports for the preceding four (4) months and the Debtor's failure to list certain assets

on his Statement of Financial Affairs and Schedules.  The Debtor filed an Opposition to the

Motion to Dismiss or Convert on April 9, 2008, and a hearing was held on April 22, 2008.  A

continued hearing was held on October 17, 2008, and a final  hearing was held on October 31, 2008.[3]

---

[1] The following proposed exhibits were admitted into evidence at trial: Plaintiff's Exhibits 1-40 and Defendant's Exhibits 1-5, and 23.

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

[3] Several creditors filed joinders to the Motion to Dismiss or Convert.

At the final hearing, the parties agreed to the appointment of a Chapter 11 Trustee. On November 5, 2008, a Consent Order Directing Appointment of Chapter 11 Trustee was entered. In the meantime, on August 12, 2008, the Court granted Attorney Haven's Motion to Withdraw as attorney for the Debtor. The Debtor has proceeded *pro se* in this matter since the withdrawal of Attorney Havens.

By Order entered on November 26, 2008, Cheryl E. Rose, Esq., was appointed Chapter 11 Trustee in the Debtor's bankruptcy case. The Order Approving Appointment of Trustee required the Debtor to file a budget and otherwise assist the Chapter 11 Trustee in compliance with 11 U.S.C. § 1106 and Fed. R. Bankr. P. 2015. *See* Plaintiff's Exhibit 18. It is undisputed that the Debtor received a copy of the Order Approving Appointment of Trustee. On August 20, 2009, the Debtor's bankruptcy case was converted to a case under Chapter 7 upon motion filed by the Chapter 11 Trustee, and Cheryl E. Rose, Esq. (the "Trustee") was appointed Chapter 7 Trustee. On July 22, 2010, the United States Trustee filed the Complaint objecting to the Debtor's discharge pursuant to sections 727(a)(2), (3), (4) and (6) of the Bankruptcy Code.[4] Attached to the Complaint are the Debtor's initial bankruptcy Schedules, the Debtor's Amended Schedule B, and the Debtor's Statement of Financial Affairs.

The Debtor's Schedule B - Personal Property states that the Debtor is a "General Partner in the S.C.C. Contracting Group, L.P. (forfeited DC LP)."[5] The Debtor testified under oath at his

---

[4] Hereafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code, unless otherwise noted.

[5] The Debtor clarified under oath at the meeting of creditors held on December 17, 2007, that his interest was as a general partner of SCS Contracting Group, L.P. ("SCS"), not S.C.C. Contracting Group, L.P. *See* Plaintiff's Exhibit 3 at 9:22-10:7. The Debtor filed an Amended Schedule B on April 9, 2008. The Amended Schedule B contains the same description and valuation of the Debtor's interest in SCS as his original Schedule B filed on November 7, 2007.

Chapter 11 meeting of creditors on December 17, 2007, that he was the 100% owner of SCS and that the only other partner he ever had in SCS was John Moody approximately four or five years earlier.  *See* Plaintiff's Exhibit 3 at 10:12-14; 69:7-13; 78:12-17; 79:16-80:6.  The Debtor testified at his Chapter 7 meeting of creditors on September 23, 2009, that he and his son, Derrick Sieber, were the owners of SCS but the Debtor could not state what their respective ownership interests were because they had not "worked that out."  *See* Plaintiff's Exhibit 4 at 66:2-69:11.  The Debtor further testified at his Chapter 7 meeting of creditors that there were no documents evidencing the ownership of SCS and that any ownership interests were based on verbal agreements.  *See* Plaintiff's Exhibit 4 at 65:4-67:1.

On December 2, 2009, the Trustee filed a Complaint for Declaratory Judgment against Derrick Sieber, the Debtor's son, in Adversary Proceeding No. 09-00825 (the "Declaratory Judgment Proceeding").  The Declaratory Judgment Proceeding sought a determination that the Debtor owned one hundred percent (100%) of SCS.  On March 16, 2010, during a trial in the Declaratory Judgment Proceeding, the Defendant testified that he owned fifty percent (50%) of SCS and that Derrick Sieber owned fifty percent (50%) of SCS.  *See* Plaintiff's Exhibit 6 at 110:22-24.  The Defendant further testified at the March 16, 2010 trial that he had never seen the Schedules filed in his bankruptcy case.  *See* Plaintiff's Exhibit 6 at 112:22-113:6; 168:21-169:11.  Ultimately, this Court submitted Proposed Findings of Fact and Conclusions of Law in the Declaratory Judgment Proceeding to the United States District Court for the District of Maryland.  The Proposed Findings of Fact and Conclusions of Law determined that the Debtor's testimony was not credible and further determined that the Debtor was the sole owner of SCS.  The District Court entered an Order consistent with this Court's Proposed Findings of Fact and Conclusions of Law, a decision that was affirmed on appeal to the United States Court of Appeals for the Fourth

4

Circuit on October 4, 2011.  The significance of the Debtor's ever-changing position regarding SCS is more fully explained below.

The Debtor's Schedule B also includes a lawsuit, *Sieber v. Brownstone Publishing Company, et al.*, filed in the D.C. Superior Court, Case No. 07-2548, (the "Brownstone Litigation").  Debtor's Schedule B provides a value of $12,565,000 for the Debtor's interest in the Brownstone Litigation.[6]  Lastly, the Debtor's Schedule B and Statement of Financial Affairs discloses the Debtor's 42.5% interest in Westmark International, Inc ("Westmark").[7]  The Debtor testified under oath at his Chapter 11 meeting of creditors that he had a 42 or 43% ownership interest in Westmark and that a variety of shareholders owned the remaining interest in Westmark. *See* Plaintiff's Exhibit 9 at 8:8-16.  The Debtor also testified at trial in the Declaratory Judgment Proceeding that he shared his 42.5% ownership interest in Westmark with his daughter and his son.  *See* Plaintiff's Exhibit 6 at 169:4-7.  The Trustee testified at trial in this matter that the Debtor's interest in Westmark and the Brownstone Litigation were the only assets of the Debtor's bankruptcy estate that had any value.  *See* Trial Transcript (10/11/2011) at 111:12-20.

On or about April 6, 2010, Derrick Sieber and the Debtor's daughter, Jill Sieber, filed an objection to the bankruptcy estate's sale of its interest in Westmark.  In their Objection, Derrick and Jill Sieber asserted that the Debtor shares his 42.5% interest in Westmark with them.  A stock certificate dated April 25, 2003, issued jointly to the Debtor, Derrick Sieber, and Jill Sieber was attached to Derrick and Jill Sieber's objection.  At the trial in this matter, Westmark's President, Edward Lyle, testified that he issued a joint stock certificate dated April 25, 2003, to the Debtor,

---

[6]  Debtor's Amended Schedule B filed on April 9, 2008, contains the same description and valuation of his interest in the Brownstone Litigation as his original Schedule B.

[7]  Debtor's Amended Schedule B filed on April 9, 2008, contains the same description and valuation of his interest in Westmark as his original Schedule B.

Derrick Sieber, and Jill Sieber. *See* Trial Transcript (10/12/2011) at 192:24-193:14. Mr. Lyle

further testified that although the stock certificate was dated April 25, 2003, he believed it was

actually issued on December 28 or 29, 2004. *See* Trial Transcript (10/12/2011) at 194:3-9. A

Westmark "Preincorporation Agreement" was executed by the Debtor and Mr. Lyle on April 25,

2003. *See* Defendant's Exhibit 2. The Preincorporation Agreement memorialized the Debtor's

and Mr. Lyle's intent to form Westmark. An "Amendment to Preincorporation Agreement was

executed by the Debtor and Mr. Lyle on December 9, 2003, setting forth that both parties have

contributed additional funds to meet the capital needs of Westmark. *See* Defendant's Exhibit 2. A

"Second Amendment to Preincorporation Agreement" for Westmark was signed by the Debtor and

Mr. Lyle on August 5, 2004 (the "Second Westmark Agreement"). *See* Defendant's Exhibit 2.

The Second Westmark Agreement states that "[s]tock certificates have not yet been issued." *See*

Plaintiff's Exhibit 16 and Defendant's Exhibit 2. A "Third Amendment to Preincorporation

Agreement" was signed by the Debtor, Edward W. Lyle, Miguel M. Arias, Christopher Petito, and

Francisco Castillo Polanco on December 28, 2004 (the "Third Westmark Agreement"). *See*

Plaintiff's Exhibit 17 and Defendant's Exhibit 2. The Third Westmark Agreement acknowledges

that the Debtor owns 42.5% of Westmark common stock and provides that in the event of the

Debtor's death, "his stock in [Westmark] shall pass to Derrick and Jill Sieber in such proportion as

specified by [the Debtor's] will or by law." *See* Defendant's Exhibit 2. The execution of the Third

Westmark Agreement is consistent with Mr. Lyle's testimony of when the back-dated joint stock

certificate dated April 25, 2003 was actually issued to the Debtor, Derrick Sieber, and Jill Sieber.

Mr. Lyle testified that he issued a second joint stock certificate from Westmark to the

Debtor, Derrick Sieber, and Jill Sieber on April 16, 2008, while the Debtor was in bankruptcy. *See*

Trial Transcript (10/12/2011) at 196:23-197:25. Mr. Lyle testified that he believed the April 16,

6

2008 stock certificate "worked out" to a 34.25% interest in Westmark. Both stock certificates, the Preincorporation Agreement, the Amendment to Preincorporation Agreement, the Second Westmark Agreement, and the Third Westmark Agreement were admitted into evidence at trial. *See* Defendant's Exhibits 1, 3 and 2, respectively.

An additional Westmark document titled "Investment/Financing Agreement" dated August 21, 2008, was admitted into evidence at trial. *See* Defendant's Exhibit 23. The Investment/ Financing Agreement contemplates a loan from William A. Ward to the Debtor in the amount of $30,000.000 for "personal use." *See* Defendant's Exhibit 23. The Investment/Financing Agreement, which was signed by the Debtor, Edward W. Lyle, Todd Ciuba, and William A. Ward, grants sole and exclusive control over all management decisions and operations of Westmark to Mr. Ward. *See* Defendant's Exhibit 23. Derrick and Jill Sieber are not parties to any of the aforementioned Westmark documents. *See* Defendant's Exhibit 2 and 23. At trial, the Debtor admitted that he and his children sold a portion of their Westmark stock to Mr. Ward post-petition. The Debtor maintained that the sale of their Westmark stock was necessary to save the company and was approved by Westmark's board of directors in the normal course of Westmark's business. The record in the Debtor's bankruptcy case, of which this Court can take judicial notice, reflects that the Debtor never sought Court authorization to sell his interest in Westmark.

While proceeding as a debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Debtor failed to file timely and accurate Monthly Operating Reports, despite receiving a copy of the "Chapter 11 Guidelines" from the Office of the United States Trustee and related briefing from a Bankruptcy Analyst with the Office of the United States Trustee. *See* Plaintiff's Ex. 20 and Trial Transcript (10/12/2011) at 127:11-128:21; 140:23-141:7; 246:1-10. The Monthly Operating Reports submitted by the Debtor were signed under penalty of perjury. *See* Plaintiffs' Exhibits 21-

37; *see also* Trial Transcript (10/12/2011) at 221:5-8.  Also while proceeding as a debtor-in-

possession, the Debtor failed to disclose certain payments he received and failed to deposit

significant sums of money he received into his debtor-in-possession account.  Plaintiff's Exhibit

38 is an Amended Summary of Debtor's Monthly Operating Reports and Payment Records (the

"Amended Summary").  The Amended Summary was prepared by Jennifer Jacobs, a Bankruptcy

Analyst with the Office of the United States Trustee.  *See* Trial Transcript (10/12/2011) at 135:9-

137:10.  Ms. Jacobs testified that she created the Amended Summary by comparing the Debtor's

Monthly Operating Reports and monthly bank statements (*see* Plaintiff's Exhibits 21-37) with

payments the Debtor received from Westmark and related insiders, and proceeds he received from

the sale of his interest in Westmark, as reflected in Plaintiff's Exhibit 12.  *See* Trial Transcript

(10/12/2011) at 137:12-140:5.  The Amended Summary reflects that the Debtor received

$67,500.00 in payments from Westmark or related insiders, which was not deposited in the

Debtor's debtor-in-possession bank account.  The Amended Summary further reflects that the

Debtor received $65,000.00 from the sale of his interest in Westmark, of which $27,000.00 was

not deposited into his debtor-in-possession bank account.

The Court has reviewed the Amended Summary[8] and the Debtor's Monthly Operating

Reports and agrees with the conclusions reached in the Amended Summary.  The Court finds that

the Amend Summary accurately demonstrates that the Debtor received significant payments from

Westmark and/or Mr. Ward that were neither deposited into his debtor-in-possession bank account

nor reflected in his Monthly Operating Reports.  *See* Plaintiff's Exhibits 12, 21-38.  The funds that

---

[8] The Amended Summary was admitted as demonstrative evidence to assist the Court but
not for the truth of the conclusions reached therein.  The Court has since reviewed the checks
and the Monthly Operating Report reflected in the Amended Summary and finds that the
information set forth in the Amended Summary is supported by the evidence admitted at trial.

the Debtor received and failed to disclose, as reflected in Plaintiff's Exhibit 12, contradict the

Debtor's testimony at trial in the Declaratory Judgment Proceeding that "anything that got paid to

me from Westmark was put in my debtor-in-possession account and reported." *See* Plaintiff's

Exhibit 11 at 174:8-13. At trial in the present proceeding, the Debtor admitted that he did not

deposit all monies he received into his debtor-in-possession account because he did not consider

funds he used for Westmark to be income. *See* Trial Transcript (10/12/2011) at 244:14-23. The

Debtor testified that Terry Miller, a bankruptcy analyst with the Office of the United States

Trustee, told the Debtor to only deposit income into his debtor-in-possession account, which the

Debtor interpreted to mean "income to Stephen C. Sieber" that he "would use to pay his bills

with." *See* Trial Transcript (10/12/2011) at 244:14-245:4.

Defendant's Exhibit 4 is a copy of an Engagement and Management Agreement signed by

the Debtor, Mr. Ward, Mr. Lyle, and Henry S. Fitzgerald on September 10, 2008 (the

"Management Agreement").[9] The Management Agreement, which was executed while the Debtor

was proceeding under Chapter 11 and while the Motion to Dismiss or Convert Case was pending,

pledges 35% of any recovery in the Brownstone Litigation to Messrs. Fitzgerald and Lyle for legal

services rendered on behalf of SCS in connection with the Brownstone Litigation. *See*

Defendant's Exhibit 4. The Management Agreement also provides that Mr. Ward would "cover up

to $50,000.00 for out-of-pocket expenses for the preparation and trial" of the Brownstone

Litigation. *See* Defendant's Exhibit 4. In return, Mr. Ward would be paid "double the amount of

all out-of-pocket expenses he covers in [the Brownstone Litigation] from Sieber's share of any

---

[9] Page 4 of the Management Agreement contains the signatures of all four parties to the
Management Agreement (the "SCS Management Committee"). The Debtor, Mr. Fitzgerald, and Mr. Lyle
signed the Management Agreement on September 10, 2008. The date that Mr. Ward signed the
Management Agreement is not legible on the copy of the Management Agreement admitted into evidence.

money received...." *See* Defendant's Exhibit 4.  Paragraph 10 of the Management Agreement

provides: "[b]y separate agreement with Sieber, Ward is to also receive eight percent (8%) of any

money received from any and all defendants by way of settlement or trial of the Brownstone

claims of Sieber *pro se* and SCS."  *See* Defendant's Exhibit 4.  Other relevant portions of the

Management Agreement include: (i) provisions that the parties to the agreement (the

"Management Committee") shall have final authority over "all matters relating to settlement

negotiations for any of the cases in the [Brownstone] Litigation" and the "decision to settle or not

to settle any such case and the terms of any settlement therein" and (ii) a condition that all

documents related to the Brownstone Litigation will be maintained at an office leased by Mr. Ward

located in Arlington, Virginia, with the parties to the Management Agreement having "key access

to those offices at all times."  *See* Defendant's Exhibit 4.  The Trustee testified, and the record in

this case reflects, that the Debtor did not obtain authorization from this Court to transfer any

portion of his interest or SCS's interest in the Brownstone Litigation pursuant to the Management

Agreement.  *See* Trial Transcript (10/11/2011) at 116:1-8.  The Debtor attempted to defend the

transfer of his interest in the Brownstone Litigation as a transaction in the ordinary course of the

Debtor's business.

In addition to the Debtor's failure to file timely and accurate Monthly Operating Reports

and failure to disclose and/or deposit all transfers and monies he received while proceeding as a

debtor-in-possession, the Debtor failed to cooperate with the Chapter 11 Trustee and the Chapter 7

Trustee after his case was converted.  James Hoffman, Esq., counsel to the Trustee, testified at trial

that he and/or the Trustee made over fifteen requests to the Debtor to provide documentation

regarding the Debtor's assets.  *See* Trial Transcript (10/12/2011) at 8:2-9:22; *see also* Plaintiff's

Exhibit 13.  One request was for SCS-related documents and was made through a subpoena *duces*

*tecum* in connection with the Declaratory Judgment Proceeding.  *See* Plaintiff's Exhibit 14.  The

Debtor failed to produce any documents pursuant to the subpoena *duces tecum*.[10]  *See* Trial

Transcript (10/12/2011) at 12:19-13:8.  Mr. Hoffman and the Trustee testified that they ultimately

received some Westmark documents from Edward Lyle and William Ward.  *See* Trial Transcript

(10/11/2011) at 194:16-195:14 and Trial Transcript (10/12/2011) at 13:20-25; 14:11-15.  Lastly,

although the Debtor sent the Trustee some budgetary information, the Debtor failed to file a

budget as required by the Order Approving Appointment of Trustee, entered in his bankruptcy

case on November 26, 2008.  *See* Plaintiff's Exhibit 19 and Trial Transcript (10/11/2011) at 77:7-

14 and Trial Transcript (10/12/2011) at 25:2-8.

## II.    Complaint

Count I of the Complaint seeks to deny the Debtor a discharge pursuant to 11 U.S.C. §

727(a)(2) based on his alleged transfer, removal, destruction or concealment of estate assets with

the intent to hinder, delay or defraud his creditors. Count II seeks to deny the Debtor a discharge

pursuant to 11 U.S.C. § 727(a)(3) based on his failure to keep or preserve books and records for

SCS, Westmark, and himself as a debtor-in-possession.  Count II alleges that the Debtor has no

justification for failing to maintain or produce documents reflecting his financial situation,

including all sources of income during the administration of his bankruptcy case and the

disposition of any proceeds generated from the sale of estate assets.  Count III seeks to deny the

Debtor a discharge pursuant to 11 U.S.C. § 727(a)(4) based on alleged false oaths and accounts.

---

[10] As set forth in this Court's Findings of Fact and Conclusions of Law entered in the
Declaratory Judgment Action, the Debtor testified at trial in the Declaratory Judgment Action that he
never received the subpoena *duces tecum* issued to SCS or the witness subpoena issued to him.
However, at a pretrial hearing held on March 2, 2010, the Debtor stated on the record that he agreed
to accept service of the subpoena and agreed to be present at the trial.

Specifically, Count III alleges that the Debtor knowingly and fraudulently, in or in connection with his bankruptcy case, made a false oath or account on his January, February, March, May, June, August, October, and November 2008 Monthly Operating Reports by failing to identify all income or monies he received.  Count III further alleges that the Debtor knowingly and fraudulently made false oaths or accounts in his bankruptcy case regarding his ownership interests in SCS and Westmark, and the value of his ownership interest in Westmark.  Count III asserts that the Debtor knowingly and fraudulently gave money that he borrowed during the pendency of his Chapter 11 case from Mr. Ward to third parties without this Court's authorization and without reporting the transactions on his Monthly Operating Reports.  Lastly, Count III states that the Debtor knowingly and fraudulently testified during the trial in the Declaratory Judgment Proceeding that he had not seen his Schedules before they were filed and did not sign them.  Count IV seeks to deny the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(6) for his failure to obey an Order of this Court. In particular, Count IV states that this Court ordered the Debtor to file a projection of his income and expenditures within ten (10) days of the date of entry of the Order Approving Appointment of [Chapter 11] Trustee entered on November 26, 2008.  The Complaint states that the Debtor failed to file his projected expenditures within the ten (10) day period specified in the Order or at anytime thereafter.

**III.    <u>Analysis</u>**

The following quote is from the Debtor's opening statement made at trial in this matter. Although not evidence, this particular quote accurately sums up the Debtor's strategy throughout his bankruptcy case and sheds light on the actions he has taken:

> The testimony is going to show that the only thing they're able to prove is that there was conflicting testimony at different times in the proceeding. Yes, that is stipulated to and the testimony will show that that is stipulated

> to. There is nothing in the world wrong with that. People change their
> testimony in the course of trials and in the course of litigation and the course
> of friendships and business all the time with just cause to do so.

*See* Trial Transcript (10/11/2011) at 48:13-22. As admitted to by the Debtor, his entire bankruptcy

case has been a moving target resulting from his inconsistent statements and actions. As the

Debtor discovered legal theories, he created a new version of the facts to fit them within the law.

His pattern of behavior throughout this case has been to make a representation, and then when

faced with an attempt by the Trustee to administer an asset in reliance on the representation, the

Debtor would change his position to hinder the Trustee's efforts. When confronted with an

inconsistency in his testimony or an omission from his pleadings filed under the penalty of perjury,

the Debtor simply says that his prior representation was made to the "best of his knowledge and

belief at the time." This has been a catchphrase of the Debtor's throughout this case. He invokes

it as though it absolves him from the consequences of his misrepresentations and failure to fulfill

his duties as a Debtor in bankruptcy. The Debtor has improperly manipulated the legal process.

The Debtor's failure to fulfill the duties of a debtor in bankruptcy, his failure to be truthful in

representing the facts, his failure to seek court authorization to undertake certain actions, and his

failure to disclose transactions during the course of his bankruptcy case have resulted in the denial

of his discharge.

## A.    <u>11 U.S.C. § 727</u>

"Section 727 of the Bankruptcy Code allows debtors to receive a general discharge of their

debt in keeping with the Code's purpose of giving honest debtors a fresh start 'unhampered by the

pressure and discouragement of preexisting debt.'" *Wachovia Bank, N.A. v. Voccia (In re Voccia)*

477 B.R. 625, 631 (Bankr. E.D. Va. 2011)(*citing Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244,

249 (4th Cir.1994)). "However, provisions enumerated in § 727(a)(1)-(10) prohibit a discharge for

those who 'play fast and loose with their assets or with the reality of their affairs.'" *Id.* (*citing Farouki,* 14 F.3d at 249). Due to the extreme penalty imposed by section 727, *i.e.,* the denial of discharge, objections to discharge are construed strictly against the objecting party and liberally in favor of the debtor. *See State Bank of India v. Chalasani (In re Chalasani*), 92 F.3d 1300, 1310 (2d Cir. 1996). The party objecting to a debtor's discharge bears the burden of proving its objection by a preponderance of the evidence. *See Farouki*, 14 F.3d at 249. "Although the burden may shift to the debtor to provide satisfactory, explanatory evidence once the creditor has established a *prima facie* case, the ultimate burden rests with the creditor." *Id.* "A party objecting to discharge need prove only one of the grounds for non-dischargeability under § 727(a) because the provisions of § 727(a) are phrased in the disjunctive." *Id.* at 250.

1.    **11 U.S.C. § 727(a)(2)**

The United States Trustee requests that the Debtor be denied a discharge under 11 U.S.C. § 727(a)(2) based on his alleged post-petition transfer of property of his bankruptcy estate with the intent to defraud the Debtor's creditors and/or the Trustee, and the Debtor's alleged concealment of the proceeds thereof. In its post-trial memorandum, the United States Trustee points to the Debtor's alleged post-petition transfers of his ownership interest in Westmark to his children and William Ward, and his post-petition transfer to Edward Lyle and Henry Fitzgerald of 35% of any recovery in the Brownstone Litigation as the bases for denying the Debtor a discharge.[11] With the exception of the alleged transfer to his children, the Debtor did not deny that the subject transfers

---

[11] The challenged transfers took place while the Debtor was proceeding as a debtor-in-possession under Chapter 11 of the Bankruptcy Code. Section 363(b)(1) permits a debtor-in-possession, after notice and a hearing, to use, sell or lease property of the estate other than in the ordinary course of business. *See* 11 U.S.C. § 363(b)(1). The Debtor was required to obtain court authorization to transfer property of the estate if such transfer was not in the ordinary course of the Debtor's business.

took place post-petition nor did the Debtor deny that he failed to account for all monies received from Westmark and/or Mr. Ward. Rather, the Debtor attempted to defend the transfer of his interest in the Brownstone Litigation as done in the ordinary course of the Debtor's business. Similarly, the Debtor argued that the sale of his Westmark stock was necessary to save the company and was approved by Westmark's board of directors in the normal course of Westmark's business. The Debtor also denied that he was required to account for all payments received from Westmark and/or Mr. Ward. For the following reasons, the Court finds that the Debtor's unauthorized actions were undertaken to hinder, delay, or defraud his creditors and the Trustee.

Section 727(a)(2)(A) provides, in relevant part:

> (a) The court shall grant the debtor a discharge, unless--
>
>     (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>
>        (A) property of the debtor, within one year before the date of the filing of the petition; or
>
>        (B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2). Section 727(a)(2) "serves to deny a discharge when the debtor 'attempts to prevent the collection of his debts by concealing or disposing of assets.'" *In re Voccia*, 477 B.R. at 632 (*quoting Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987)). To bar a debtor's discharge under section 727(a)(2)(B), the plaintiff must prove each of the following four elements by a preponderance of the evidence: (1) a transfer of property, (2) belonging to the estate, (3) after the date of the filing of the petition, (4) with the intent to hinder, delay, or defraud a creditor or officer of the estate. *See First Union National Bank v. Golob (In re Golob)*, 252 B.R. 69, 78 (Bankr. E.D. Va. 2000). "A debtor may be denied a discharge for his

15

post-filing conduct either in connection with a Chapter 11 case or following conversion of the case to Chapter 7." *Tavormina v. Van Den Heuvel (In re Van Den Heuvel)*, 125 B.R. 846, 849 (Bankr. S.D. Fla. 1991).

The Bankruptcy Code defines the term transfer broadly:

> (54) The term "transfer" means--
>> (A) the creation of a lien;
>> (B) the retention of title as a security interest;
>> (C) the foreclosure of a debtor's equity of redemption; or
>> (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with--
>>> (i) property; or
>>>
>>> (ii) an interest in property.

11 U.S.C. § 101(54).  "Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control, even if there is no transfer of title, because possession, custody, and control are interests in property."  *In re Golob*, 252 B.R. at 78 (*quoting* 6 *COLLIER ON BANKRUPTCY* ¶ 727.02[5]).

Because section 727(a)(2)(A) is worded in the disjunctive, it is not necessary to prove fraudulent intent in order to deny a discharge.  *Consumers United Capital Corp. v. Greene (In re Greene),* 202 B.R. 68, 73 (Bankr. D. Md. 1996).  Nevertheless, where a plaintiff alleges that a debtor intended to defraud a creditor or officer of the estate, courts may rely on certain badges or indicia of fraud to determine whether a transfer was fraudulently conducted under section 727. *Lafarge N.A., Inc. v. Poffenberger (In re Poffenberger)*, 471 B.R. 807, 816 (Bankr. D. Md. 2012) (*citing Zanderman, Inc. v. Sandoval (In re Sandoval)*, No. 96-2391, 1998 WL 497475, at *2 (4th Cir. Aug. 10, 1998)).  "These 'badges of fraud' include: (1) whether there is a lack or inadequacy of consideration for the transfer; (2) whether there is a family or insider relationship between the

parties; (3) whether there is some retention of possession, benefit or use of the property in question by the debtor; (4) whether the financial condition of the debtor before and after the transfer is suspicious; (5) whether there is a pattern or series of transactions after the onset of the financial difficulties or pendency of threat of suit by creditors; (6) whether there is a suspicious chronology of events and transfers; (7) whether the debtor attempted to keep the transfer a secret; and (8) the proximity of the transfer to the debtor's bankruptcy filing." *Id.* "The presence of just one of the above listed factors can warrant a court's conclusion that a transfer was fraudulently made, and, certainly, the presence of several factors 'can lead inescapably to the conclusion that the debtor possessed the requisite intent.'" *In re Sandoval,* 1998 WL 497475, at *2 *(quoting In re Penner,* 107 B.R. 171, 175 (Bankr. N.D. Ind. 1989)). "Indeed, certain 'badges of fraud' will strongly suggest a purpose to defraud unless some other convincing evidence appears." *Cullinan Associates, Inc. v. Clements,* 205 B.R. 377, 380 (W.D. Va. 1995)(*citing In re Woodfield,* 978 F.2d 516, 518 (9th Cir. 1992)).

As stated above, the United States Trustee challenges the Debtor's post-petition transfer of his ownership interest in Westmark and the concealment of the proceeds thereof. The United States Trustee also challenges the Debtor's post-petition transfer to Edward Lyle and Henry Fitzgerald of 35% of any recovery in the Brownstone Litigation. As for the former, the United States Trustee argues that the Westmark stock transfers were made to the Debtor's close relatives and colleagues, while the Debtor was insolvent and without any consideration from his children.

Addressing the alleged transfer of Westmark stock to the Debtor's children first, the Court finds insufficient evidence to conclude that the Debtor transferred a portion of his Westmark stock to his children post-petition. The Debtor testified that he shared his ownership interest in Westmark with his two children and that he had their consent to sell, vote or transfer

17

their ownership rights.  *See* Trial Transcript (10/12/2011) at 216:25-218:19.  Although the Court

does not find the Debtor to be a credible witness, his assertion of joint ownership was supported

by other evidence.  Both stock certificates were issued jointly to the Debtor and his children.

Although the back-dating of the First Stock Certificate is suspect and some of the provisions in

the Westmark management documents are inconsistent with the trial testimony regarding who

had an interest in Westmark, Mr. Lyle's testimony supported the Debtor's position that his

interest in Westmark was shared with his children.  The United States Trustee simply presented

insufficient evidence for this Court to conclude otherwise.

The Court reaches a different conclusion with respect to the Brownstone Transfers and

the sale of Westmark stock to Mr. Ward (the "Stock Sale").  As set forth above, the Debtor did

not dispute that these transfers occurred post-petition and without Court authorization.  Nor did

the Debtor deny that he failed to deposit all payments received from Westmark and/or all

proceeds of the Stock Sale into his debtor-in-possession account or disclose them in his Monthly

Operating Reports.  Therefore, the remaining issue for the Court to determine is whether the

Debtor conducted these transfers and concealed the Westmark payments and Stock Sale

proceeds with the intent to hinder, delay, or defraud a creditor or officer of the estate.  *See In re*

*Golob*, 252 B.R. at 78.  For this, the Court looks to see if any of the aforementioned badges of

fraud are present so support a finding of intent to hinder, delay, or defraud the Trustee and

creditors of the estate.

The facts of this case reveal several badges of fraud sufficient to deny the Debtor a

discharge under 11 U.S.C. § 727(a)(2)(B).  First and foremost, the timing of the Brownstone

Transfers and the Stock Sale are suspicious.  As set forth above, the United States Trustee filed

the Motion to Dismiss or Convert on March 25, 2008.  On April 16, 2008, less than one week

18

before the scheduled hearing on the Motion to Dismiss or Convert, a second Westmark stock certificate was issued to the Debtor and his children reflecting their reduced ownership interest in Westmark as a result of the Stock Sale.  The Management Agreement, which contemplated the Brownstone Transfers and vested the Management Committee with final settlement authority over the Brownstone Litigation, was executed on September 10, 2008, also while the Motion to Dismiss or Convert was pending.[12]  Based on the timing of the transfers relative to the pending Motion to Dismiss or Convert, the Court finds that they were done in anticipation of the potential conversion of this case to Chapter 7.  If converted, a Chapter 7 trustee would have been appointed to administer the Debtor's assets and assume control over the Brownstone Litigation.  Any proceeds from the sale of the Debtor's assets or the favorable resolution of the Brownstone Litigation would have become property of the bankruptcy estate subject to the control of a Chapter 7 trustee and used to satisfy claims against the estate.  Instead, the Debtor sold his interest in Westmark prior to the appointment of a trustee and was able to use the proceeds for whatever purpose he saw fit without accounting to his creditors for the sale and use of funds.  As for the Management Agreement, it was an attempt to dilute the bankruptcy estate's control over the Brownstone Litigation on the eve of the potential appointment of a trustee.

In addition to the suspicious timing of the transfers, other badges of fraud present here include the insider relationship between the Debtor and Mr. Ward, the Debtor's failure to obtain Court authorization to transfer property of the bankruptcy estate, the Debtor's failure to disclose the Stock Sale in his Monthly Operating Reports or elsewhere, the Debtor's concealment of the

---

[12] As set forth previously, the initial hearing on the Motion to Dismiss or Convert was held on April 22, 2008.  Continued hearings were held on October 17, 2008 and October 31, 2008.  The Consent Order Directing Appointment of Chapter 11 Trustee was entered on November 5, 2008.

Stock Sale proceeds, and the Debtor's suspicious financial condition before and after the transfers. The Debtor's Monthly Operating Reports were inaccurate and incomplete, making it impossible for the United States Trustee and creditors to monitor the Debtor's post-petition operations. The Debtor simply carried on his affairs without regard to the statutory obligations and restrictions placed on a debtor-in-possession.

Once the United States Trustee established a *prima facie* case that the Debtor should be denied a discharge under section 727(a)(2), which it did, the burden of proof shifted to the Debtor to provide satisfactory, explanatory evidence for his actions. *See Farouki*, 14 F.3d at 249. Here, the Debtor denied that he was required to obtain Court authorization for the subject transfers and denied that he concealed the Stock Sale proceeds and other payments from Westmark because he did not consider those monies to be personal income required to be deposited into his debtor-in-possession account or disclosed in his Monthly Operating Reports. In justifying the unauthorized nature of the Stock Sale, the Debtor testified that Westmark was insolvent at the time he and his children sold some of their Westmark shares to Mr. Ward, and that other Westmark shareholders sold stock and stock options to Mr. Ward in the "normal course of Westmark business beginning in 2008." *See* Trial Transcript (10/12/2011) at 220:25-221:13. The Debtor testified that the second Westmark stock certificate issued to the Debtor and his children on April 16, 2008, represented their reduced ownership interest in Westmark resulting from the "sale of stock by [the Debtor] and his children as approved by the Westmark board in the normal course of Westmark business." *See* Trial Transcript (10/12/2011) at 221:14-21. The Debtor further testified that he was acting in the best interest of Westmark when selling his jointly-owned stock and that his "fiduciary responsibilities and authority as a board member of Westmark are outside the jurisdiction of the United States Trustee." *See* Trial Transcript

20

(10/12/2011) at 221:28.  The Debtor maintained that he "exercised [his] best business judgment as a debtor-in- possession when [he] authorized – when [he] voted as a Westmark board member to sell portions of [his] jointly owned stock [to William A. Ward]."  *See* Trial Transcript (10/12/2011) at 238:2-7.  The Debtor denied that he ever intended to deceive anyone involved in his bankruptcy case and stated that "[a]ll representations made by [him] throughout this entire proceeding were to the best of [his] knowledge and belief and done with honor and character and belief in the truth."  *See* Trial Transcript (10/12/2011) at 238:7-14.  The Debtor denied that he concealed the sale proceeds because he did not consider those monies to be personal income required to be deposited into his debtor-in-possession account or disclosed in his Monthly Operating Reports.  *See* Trial Transcript (10/12/2011) at 222:25-223:22.  Rather, the Debtor maintained that the sale proceeds "resulted in the further development of [Westmark's technology] and added significant value to Westmark."  *See* Trial Transcript (10/12/2011) at 223:3-22.  Similarly, the Debtor denied that he was required to account for certain payments he received from Westmark because they were earmarked for him to pay Westmark expenses.  *See* Trial Transcript (10/12/2011) at 189:10-190:23; 244:14-22; 250:10-21.

With respect to the Debtor's transfer of 35% of any recovery in the Brownstone Litigation to Messrs. Fitzgerald and Lyle for legal services rendered on behalf of SCS in the Brownstone Litigation, and the transfer of 8% of any recovery to Mr. Ward plus double the amount of expenses covered by Mr. Ward (together, the  "Brownstone Transfers"), the Debtor unsuccessfully attempted to elicit testimony on cross-examination of the Trustee that the Brownstone Transfers was done in the ordinary course of the Debtor's business.  *See* Trial Transcript (10/11/2011) at 154:9-157:14.  The Trustee repeatedly testified that litigation was not in the ordinary course of the Debtor's business.  *See* Trial Transcript (10/11/2011) at 154:9-

157:14.

The Court finds that the Debtor's explanations do not provide satisfactory evidence for his actions. *See Farouki*, 14 F.3d at 249. The Debtor is an individual with ownership interests in a defunct contracting company (SCS) and a start-up clothing apparel corporation. As the Trustee correctly testified, selling stock and engaging in litigation are not the Debtor's business. Accordingly, Court authorization was required to conduct the transfers pursuant to 11 U.S.C. § 363(b). Moreover, the Debtor received a copy of the Chapter 11 Guidelines setting forth the duties and obligations of a debtor-in-possession from the Office of the United States Trustee, including the obligation to report all income received, and a related briefing from a Bankruptcy Analyst with the Office of the United States Trustee. As the Trustee testified on cross-examination, even if the Stock Sale proceeds were reinvested into Westmark or the payments received by the Debtor were used to pay Westmark expenses, the Debtor still had an obligation to deposit the funds into his debtor-in-possession account and report any Westmark expenses paid therefrom. *See* Trial Transcript (10/11/2011) at 278:9-13. The Debtor's justifications simply do not overcome the Plaintiff's *prima facie* case.

In sum, the Court finds that the Stock Sale, the subsequent concealment of the Stock Sale's proceeds, and the concealment of other funds paid to the Debtor by Westmark were done with the intent to hinder, delay, or defraud creditors of the Debtor's bankruptcy estate and the Trustee who was subsequently appointed. The Court further finds that the Brownstone Transfers were an attempt to dilute the bankruptcy estate's interest in any proceeds derived from the Brownstone Litigation and divest the bankruptcy estate of sole control over the Brownstone Litigation in anticipation of the appointment of a Chapter 7 trustee. For these reasons, the Debtor shall be denied a discharge pursuant to section 727(a)(2).

22

2.      __11 U.S.C. § 727(a)(3)__

The United States Trustee asserts that the Debtor should be denied a discharge under section 727(a)(3) based on his alleged concealment, destruction, falsification, or failure to keep or preserve records, including tax returns, for SCS, Westmark, and himself as debtor-in-possession, after the date of the filing of the Petition.  The Debtor maintains that the requested documents either never existed or that he directed the Trustee to the person with possession of the requested documents.  As set forth below, the Court finds the Debtor's justifications inadequate to rebut the Plaintiff's evidence that the Debtor failed to keep and preserve his financial records.

Section 727(a)(3) provides that the Court shall grant the debtor a discharge unless the Debtor has "failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under the circumstances of the case." 11 U.S.C. § 727(a)(3).  "Debtors have an affirmative duty to provide documents that memorialize their financial history for a reasonable period past to present, and neither the trustee nor the creditors is required to ferret out the required records."  *Bakst v. Isles (In re Isles)*, 297 B.R. 910, 915 (Bankr. S.D. Fla. 2003)(*citing In re Craig,* 252 B.R. 822, 828 (Bankr. S.D. Fla. 2000)).  "The purpose of Section 727(a)(3) is to give creditors sufficient information from which they can assess the debtor's estate and general financial posture."  *Union Bank of the Middle East, LTD v. Farouki (In re Farouki)*, 133 B.R. 769, 780-781 (Bankr. E.D. Va. 1991).  "The records produced by a debtor are adequate if they reflect the debtor's finances with a fair degree of accuracy and in a manner appropriate to the debtor's business."  *Id.* at 781.  Bankruptcy courts have substantial discretion in determining whether the records produced by the Debtor satisfy the

requirements of section 727(a)(3).  *Id.*

There is no intent requirement under this section; "only a showing that the debtor failed to keep records that a reasonable person would maintain is necessary." *Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 665 (Bankr. S.D.N.Y. 2008)*(citing Jacobowitz v. The Cadle Co. (In re Jacobowitz),* 309 B.R. 429, 440 (S.D.N.Y. 2004)).  "This is demonstrated not by a failure to maintain records in any special form, but by a failure to maintain records that make complete disclosure, which is a condition precedent to granting discharge, possible." *Id. (citing In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936)).  "The factors considered to determine the adequacy of records include the complexity and volume of the business; the amount of the debtor's obligations; whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; the debtor's education, business experience and sophistication; the customary business practices for record keeping in the debtor's type of business; the degree of accuracy disclosed by the debtor's existing books and records; the extent of any egregious conduct on the debtor's part; and the debtor's courtroom demeanor.  *Id.*  The Bankruptcy Code does not require that a debtor's books be perfect, "but it does require debtors to maintain records in a manner that is reasonable under the circumstances of the particular case." *See Mercantile Peninsula Bank v. French (In re French),* 499 F.3d 345, 355 (4th Cir. 2007)*(quoting In re Greene*, 202 B.R. 68, 71 (Bankr. D. Md. 1996)).  The essential requirement of § 727(a)(3) are that the records:

> sufficiently identify the transactions so that intelligent inquiry can be made of them. The test is whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.

*Id. (quoting Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d. Cir. 1992)).  Referring a trustee to third parties in possession of a debtor's financial and business records does not constitute

24

compliance with a debtor's statutory duties to provide such information. *See* 11 U.S.C. §

521(a)(4); *see also Gold v. Guttman (In re Guttman)*, 237 B.R. 643, 650 (Bankr. E.D. Mich.

1999)(holding that if a debtor is not in possession of requested documents, it is the debtor's duty

to take action to obtain them and turn them over to the trustee, not to send the trustee in search of

them).

Courts recognize a shifting burden of production under section 727(a)(3). *See In re

Gardner*, 384 at 665. Once the objecting party meets its initial burden by showing that a debtor's

records are insufficient to ascertain the debtor's financial condition and business transactions,

"the burden of production shifts to the debtor to produce additional credible evidence to rebut the

proof of insufficient records, or to justify the absence of records." *Id*.

In this case, the United States Trustee met its burden of demonstrating that the Debtor

failed to provide parties in interest with sufficient information to assess the his general financial

posture. *See In re Farouki*, 133 B.R. at 780-781. The evidence was clear that the Debtor

repeatedly failed to produce documents to the Trustee and/or her counsel despite their numerous

requests. The Trustee testified that the Debtor failed to provide her with documents concerning

the Debtor's financial condition, including his tax returns and documents related to SCS and

Westmark. *See* Trial Transcript (10/11/2011) at 78:1-18; 172:8-12; 192:5-193:18. The Trustee

testified that the Debtor failed to keep records from which she could ascertain financial

transactions in the case. *See* Trial Transcript (10/11/2011) at 125:17-22. The Trustee further

testified that the Debtor's Monthly Operating Reports were delinquent and those reports that were

filed were not very informative. *See* Trial Transcript (10/11/2011) at 78:19-22; 125:20-22. The

Trustee's attorney, James Hoffman, Esq., testified that he and/or the Trustee made over fifteen

requests to the Debtor for documents regarding his interest in Westmark and the Brownstone

25

Litigation and that the Debtor "kept promising" that he would provide the requested documents but he failed to do so. *See* Trial Transcript (10/12/2011) at 8:2-9:22; 62:14-15.

Not only did the evidence establish the Debtor's failure to provide pertinent financial information to the Trustee and creditors, the evidence also proved that post-petition, the Debtor voluntarily and without Court approval, placed relevant and important documents regarding his business affairs outside of his possession and control, and placed them in the control of third parties. Moreover, the Debtor made no attempt to regain possession of the documents or provide them to the Trustee when requested to do so. The agreements that the Debtor argued prohibited him from turning certain documents over to the Trustee, namely, the Engagement Agreement and the Investment/ Financing Agreement, were entered into by the Debtor post-petition, without Court authorization, and while the Motion to Dismiss or Convert was pending. In other words, the agreements pursuant to which the Debtor placed his business and financial records out of his control were executed by the Debtor while facing the potential conversion of his case to Chapter 7 and corresponding appointment of a trustee.

The Debtor attempted to rebut the Plaintiff's allegations by arguing that most of the documents sought by the Trustee either never existed or were out of his control. The Debtor maintained that he fully cooperated with the Trustee by directing her or her counsel to the individuals in possession of the requested documents. *See* Trial Transcript (10/11/2011) at 185:4-10; 193:10-194:15. The Debtor argued that pursuant to the Management Agreement, he was required to turnover all documents related to SCS and the Brownstone Litigation, including his personal and business tax returns, to the Management Committee with such documents to be maintained at an office located in Arlington, Virginia. *See* Defendant's Exhibit 4; *see also* Trial Transcript (10/12/2011) at 229:4-11. The Debtor testified that he "informed the Trustee at least

26

15 times throughout the course of his bankruptcy proceeding that the Trustee should contact SCS counsel to obtain SCS documents." *See* Trial Transcript (10/12/2011) at 229:17-20.  While cross examining Mr. Hoffman, the Debtor asked whether the Management Agreement provided that the Management Committee would have to approve the delivery of any documents to the Trustee. *See* Trial Transcript (10/12/2011) at 55:6-8.  Mr. Hoffman answered that the Management Agreement was never approved by the Bankruptcy Court and does not reference turning documents over to him.  *See* Trial Transcript (10/12/2011) at 55:9-11.  Mr. Hoffman further testified that he told the Debtor that it was the Debtor's responsibility to produce documents requested by the Trustee, not the responsibility of third parties.  *See* Trial Transcript (10/12/2011) at 63:4:12.  Henry Fitzgerald testified at trial that no document was permitted to leave the office in Arlington, Virginia without the Management Committee's consent.  *See* Trial Transcript (10/12/2011) at 148:18-149:10.  Although Mr. Fitzgerald testified that he was never subpoenaed to provide the Trustee with any documents related to SCS, he also testified that anyone entitled to information concerning SCS could have obtained copies of the documents being kept at the Arlington, Virginia office and that he did not know that the Trustee had requested documents related to SCS from the Debtor.  *See* Trial Transcript (10/12/2011) at 149:15-23; 159:16-160:1.

Similarly, the Debtor testified that he informed the Trustee at least 15 times throughout his bankruptcy case that he had no documents relating to Westmark and that he told the Trustee he could obtain any Westmark documents from William Ward or Edward Lyle.  *See* Trial Transcript (10/12/2011) at 231:1-12.  On cross-examination by the Debtor, Mr. Lyle was asked whether the Debtor ever asked Mr. Lyle if he (the Debtor) could take possession of Westmark's books and records.  *See* Trial Transcript (10/12/2011) at 185:2-4.  Mr. Lyle answered that he did not "let the books and records of Westmark out of his possession...."  *See* Trial Transcript (10/12/2011) at

27

185:7-9.  Mr. Lyle testified that he believes the Debtor told him that Mr. Hoffman wanted some

documents and that he preferred that the Debtor ask Mr. Hoffman to call him directly and he

would check with the other board members about complying with any document requests.  *See*

Trial Transcript (10/12/2011) at 185:12-17.  Mr. Lyle further testified that he provided documents

to the Trustee's counsel to the best of his ability.  *See* Trial Transcript (10/12/2011) at 184:24-

185:1.  The Debtor also relied on the Investment/Financing Agreement to support his position that

he was prohibited from providing Westmark documents to the Trustee.  While cross-examining

Mr. Hoffman, the Debtor asked Mr. Hoffman to read a portion of the Investment/Financing

Agreement into the record pertaining to Mr. Ward's control over Westmark's business

operations.[13]  *See* Trial Transcript (10/12/2011) at 86:17-24.  The Debtor argued that based on this

provision, he told Mr. Hoffman that the Trustee could obtain Westmark documents from Mr.

Ward.  *See* Trial Transcript (10/12/2011) at 88:6-16.  Although the Debtor implied that the

Investment/ Financing Agreement prohibited him from accessing Westmark documents, Mr.

Hoffman testified, and the Court agrees, that Mr. Ward's control over Westmark's business

operations did not preclude the Debtor from turning over Westmark documents to the Trustee.

*See* Trial Transcript (10/11/2011) at 88:9-20.

    With respect to tax returns, no tax returns were ever provided to the Trustee.  *See* Trial

---

[13] Mr. Hoffman read the following portion of the Investment/Financing Agreement into
the record:

> Further, it is understood by all parties subject to this agreement that Ward
> shall have sole and exclusive control over management and decisions,
> including authority over all day to day business elements of Westmark
> beginning August 21, 2008 through September 30, 2009.  This exclusive
> management authority supersedes all prior agreements and over the
> authority of any board member regardless of position or interest in
> Westmark.

*See* Trial Transcript (10/12/2011) at 86:17-24.

Transcript (10/11/2011) at 187:2.  Mr. Lyle testified that he gave the Debtor's former bankruptcy

attorney, Attorney Havens, various financial documents, including tax returns, although he could

not remember what specific documents were provided to Mr. Havens.  *See* Trial Transcript

(10/12/2011) at 175:11-14.  Mr. Lyle further testified that he attempted to retrieve the documents

from Mr. Havens but no documents were returned to Mr. Lyle.  *See* Trial Transcript (10/12/2011)

at 175:15-25.  While cross-examining the Trustee, the Debtor asked whether he ever told the

Trustee that his tax records were being used for damages in the Brownstone Litigation and in the

possession of Mr. Havens.  *See* Trial Transcript (10/11/2011) at 187:3-8.  The Trustee answered

that she did not recall being told that information and she stated that the Debtor always has the

right to get duplicate copies of his tax returns from the IRS.  *See* Trial Transcript (10/11/2011) at

187:8-14.  The Debtor responded that he was unaware that was the case, to which the Trustee

responded that that is the risk of representing oneself.  *See* Trial Transcript (10/11/2011) at

187:12-22.

      The Court finds the Debtor's justifications for his failure to provide information to the

Trustee to be inadequate.  11 U.S.C. § 521(a) imposes specific duties on a debtor.  Subsection

(a)(3) provides that a debtor shall "cooperate with the trustee as necessary to enable the trustee to

perform the trustee's duties under this title."  11 U.S.C. § 521(a)(3).  Subsection (a)(4) provides

that a debtor shall "surrender to the trustee all property of the estate and any recorded

information, including books, documents, records, and papers, relating to property of the estate,

whether or not immunity is granted under section 344 of this title."  11 U.S.C. § 521(a)(4).

Although there was no evidence that the Debtor concealed the requested documents, and in fact,

the uncontroverted testimony was that the Trustee ultimately received some Westmark documents

from third parties, it is clear that the Debtor placed relevant financial information out of his

control and abdicated his responsibility to obtain them and turn them over to the Trustee.  The

Debtor's personal and business tax returns are particularly troublesome.  Those documents were

never produced to the Trustee and would have assisted her in assessing a more complete picture

of the Debtor's assets and potential damages in the Brownstone Litigation.  Even if the Debtor

had turned his personal and business tax returns over to Mr. Lyle or Mr. Havens and was unable

to retrieve them, the Debtor could have obtained copies of his returns from the various taxing

authorities if he was unable to locate his originals.

   In sum, the Court finds that the Debtor attempted to obtain the benefits of filing for

bankruptcy without bearing any of the burdens of a debtor in bankruptcy.  The Debtor failed to

keep or preserve sufficient records from which his financial condition and transactions could be

ascertained.  The limited financial information provided by the Debtor in the form of his sporadic

Monthly Operating Reports did not make a complete disclosure of his financial condition, which

is a condition precedent to obtaining a discharge.  *See In re Gardner*, 384 B.R. at 665.  Although

the Debtor has testified previously that he has only a high school education, the Debtor ran a

profitable contracting business for a number of years prior to filing for bankruptcy.  He had

sufficient business experience to file timely and complete Monthly Operating Reports in

accordance with the guidelines provided and explained to him by the Office of the United States

Trustee.  The Court further finds that despite the production of certain documents by third parties,

the Debtor, without Court approval, voluntarily placed his financial documents out of his control

and abdicated his responsibility to obtain and produce them to the Trustee.  Although the

evidence does not clearly indicate what documents were or were not produced to the Trustee by

third parties, it is unrefuted that the Trustee never received tax returns for the Debtor, SCS, and/or

Westmark.  Accordingly, section 727(a)(3) provides an additional basis to deny the Debtor a

discharge.

**3.       11 U.S.C. § 727(a)(4)(A)**

Count III of the Complaint seeks to deny the Debtor a discharge pursuant to 11 U.S.C. §

727(a)(4) based on alleged false oaths and accounts made in connection with the Debtor's

bankruptcy case.  The Debtor responded to Count III by stating that all actions and

representations made by him throughout his bankruptcy case were to the best of his knowledge

and belief.  As set forth below, the Court finds sufficient basis to deny the Debtor a discharge

under section 727(a)(4).

To be denied a discharge pursuant to section 727(a)(4)(A) of the Bankruptcy Code, the

objecting party must prove by a preponderance of the evidence that:

> 1) the debtor made a statement under oath;
> 2) the statement was false;
> 3) the debtor knew the statement was false;
> 4) the debtor made the statement with fraudulent intent; and
> 5) the statement materially related to the bankruptcy case.

*Sheehan v. Stout (In re Stout),* 348 B.R. 61, 64 (Bankr. N.D.W.Va. 2006) (*citing Williamson v.*

*Fireman's Fund Ins. Co.,* 828 F.2d 249, 251-52 (4th Cir. 1987)).  "In order to be denied a

discharge under this provision, 'the debtor must have made a statement under oath which he knew

to be false, and he must have made the statement willfully, with the intent to defraud.'" *In re*

*French,* 499 F.3d at 352 (*quoting Williamson,* 828 F.2d at 251).  In evaluating a claim under §

727(a)(4)(A), the Fourth Circuit Court of Appeals has recognized that the question of whether a

debtor has made a false oath is generally a question of fact.  *See id.*  "[A] determination

concerning fraudulent intent [under § 727(a)(4)(A)] depends largely upon an assessment of the

credibility and demeanor of the debtor." *Id. at 353 (citing Williamson,* 828 F.2d at 252)).  Once it reasonably appears that the oath is false, however, the burden falls upon the debtor to provide evidence that he has not committed the offense charged.  *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 482 (E.D. Va. 1997).  As stated earlier, a debtor may be denied a discharge based on his/her pre-conversion conduct.  *In re Van Den Heuvel*, 125 B.R. at 849.

Because a debtor is unlikely to admit that he acted with fraudulent intent, fraudulent intent may be established in one of two ways.  *In re Hatton*, 204 B.R. at 483-484.  First, it may be established by circumstantial evidence or by inference drawn from a course of conduct.  *Id. (citing Williamson,* 828 F.2d at 252).  "Thus a 'pattern of concealment and nondisclosure' would permit an inference of the requisite intent."  *Id. (citing In re Ingle,* 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987)).  Second, "courts have determined that a 'reckless indifference to the truth' constitutes the 'functional equivalent of fraud.'"  *Id. (citing In re Johnson,* 139 B.R. 163, 166 (Bankr. E.D. Va. 1992)).  "A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."  *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294-95 (10th Cir. 1997).

Here, the United States Trustee alleges that the Debtor knowingly and fraudulently, in or in connection with this case, made several false oaths and/or accounts.  Specifically, the Complaint alleges that: (i) the Debtor made false oaths or accounts on his Monthly Operating Reports by failing to identify all income or monies he received and/or loans obtained; (ii) the Debtor knowingly and fraudulently made false oaths or accounts regarding his ownership of SCS and Westmark and the value of his ownership interest in Westmark; (iii) the Debtor knowingly and fraudulently gave money to Derrick Sieber and to Ed Lyle from funds the Debtor borrowed from William Ward without this Court's authorization; (iv) the Debtor knowingly and

fraudulently sold some of his Westmark stock to William Ward without Court authorization and without disclosing the sale proceeds in his bankruptcy case; and (v) the Debtor knowingly and fraudulently testified during the trial in the Declaratory Judgment Proceeding that he did not see or review his bankruptcy Schedules before they were filed and that he did not sign them.

The Debtor's post-trial memorandum summarizes his defenses to Count III.  The Debtor maintains that he completed the Monthly Operating Reports to the "best of his knowledge and belief when claiming income that was paid to the defendant in a personal capacity."  He maintains that any Westmark monies not disclosed in his Monthly Operating Reports were funds that the Westmark board and William Ward mandated be paid to the Debtor for work performed on behalf of Westmark and that any funds not disclosed was a "harmless error" because the result would have been the same, presumably because he would have just listed them as expenses.  Mr. Lyle partially corroborated the Debtor's position by testifying that the Westmark board of directors decided that some checks for Westmark expenses would be issued to the Debtor.  *See* Trial Transcript (10/12/2011) at 188:19-24.

The unrefuted  evidence shows numerous inconsistencies between the Debtor's bankruptcy Schedules and his testimony regarding his interest in SCS throughout his bankruptcy case.  The Debtor's bankruptcy Schedules reflect that he is a general partner of SCS.  The Debtor testified under oath at his Chapter 11 meeting of creditors that he was the 100% owner of SCS and that the only other partner he ever had in SCS was John Moody approximately four or five years earlier.  *See* Plaintiff's Exhibit 3 at 10:12-14; 69:7-13; 78: 12-17; 79:16-80:6.  The Debtor testified at his Chapter 7 meeting of creditors on September 23, 2009, that he and his son were the owners of SCS but the Debtor could not state what their respective ownership interests were

because they had not "worked that out."  *See* Plaintiff's Exhibit 4 at 66:2-69:11.  On March 16,

2010, during a trial in the Declaratory Judgment Proceeding, the Defendant testified that he and

his son each owned 50% of SCS.  *See* Plaintiff's Exhibit 6 at 110:22-24.  At trial in the instant

matter, the Trustee testified that she believed the Debtor lied about his ownership interest in SCS

because "the story changes when it's convenient."  *See* Trial Transcript (10/11/2011) at 217:10-

15.  Without question, the Debtor either lied on his Schedules and while under oath at his Chapter

11 meeting of creditors, or lied in his testimony at subsequent stages of this case.  The Debtor

admitted as much in his opening statement—his testimony changed throughout this bankruptcy

proceeding depending on the nature of the dispute.[14]

    As previously found by this Court in its Proposed Findings of Fact and Conclusions of

Law entered in the Declaratory Judgment Proceeding, the Debtor's testimony at the Declaratory

Judgment trial was not credible based on (i) the inconsistencies between his trial testimony and

his prior sworn statements and representations, and (ii) the timing and convenience of his change

in position regarding the ownership of SCS as it relates to controlling the Brownstone Litigation

and hindering the Trustee's attempt to settle the litigation.  The Court did not find the Debtor's

testimony at the trial in this proceeding to be any more credible.  The Debtor merely invoked his

catchphrase that his prior sworn statements were made "to the best of [his] knowledge and belief

at the time."  *See* Trial Transcript (10/12/2011) at 232:22-233:7; 233:21-234:1; 234:17-21.  His

testimony simply did not overcome the indicia of fraudulent intent found in the timing of his

change in position regarding his interest in SCS.  The suspect timing and the Debtor's failure to

adequately explain his reverse in position leads this Court to conclude that it was done, at a

---

[14] These inconsistencies are set forth in greater detail in this Court's Proposed Findings of
Fact and Conclusions of Law issued in the Declaratory Judgment Proceeding.

minimum, with a reckless indifference to the truth sufficient to satisfy the fraudulent intent element of section 727(a)(4). *See In re Hatton*, 204 B.R. at 484. The Debtor's change in position came immediately after the appointment of the Chapter 7 Trustee and while she was attempting to settle the Brownstone Litigation for less than what the Debtor believed it to be worth. As for materiality, the Debtor's false statement were material because they were relevant to the Trustee's ability to administer the largest asset of the Debtor's bankruptcy estate.

The Court further finds that the Debtor knowingly and fraudulently made false oaths and accounts on his Monthly Operating Reports by failing to disclose monies he received from Westmark and William Ward. As detailed in the previous section, the Court has reviewed Plaintiff's Exhibit 38 and compared it to the Monthly Operating Reports and copies of checks that were admitted into evidence.[15] Plaintiff's Exhibit 12 includes multiple checks made payable to and negotiated by the Debtor that are not reflected, either in whole or in part, in his Monthly Operating Reports and/or the bank statements attached thereto. The Debtor defended these omissions and discrepancies by stating that he did not believe he had to report monies he received on behalf of Westmark that was to be used for Westmark expenses and that his Monthly Operating Reports were completed "to the best of his knowledge and belief." *See* Trial Transcript

---

[15] At trial, the Debtor questioned the Trustee as to Mr. Ward's credibility and the authenticity of the check copies Mr. Ward submitted to the Trustee pursuant to a Rule 2004 subpoena. These checks were admitted into evidence as Plaintiff's Exhibit 12. Although the Debtor objected at trial to their admission, Plaintiff's Exhibit 12 was ultimately admitted into evidence because the Debtor failed to object to their admission prior to the trial as required by the Scheduling Order entered in this proceeding. Based on the Debtor's failure to timely object to Plaintiff's exhibits, the Plaintiff did not subpoena Mr. Ward to testify at trial. Nor did the Debtor call Mr. Ward as a witness. This Court finds that the copies of checks payable to and negotiated by the Debtor included in Exhibit 12; namely, those checks for which copies of the front and back have been provided, contain sufficient indicia of reliability to support the Plaintiff's allegations that they are what they purport to be.

(10/12/2011) at 223:7-10; 250:10-25.  The Court did not find the Debtor's testimony on this issue to be credible nor does his feigned ignorance of the reporting requirements justify his actions. The Debtor was made aware of the reporting requirements of a debtor-in-possession and he failed to fulfill those requirements by submitting incomplete Monthly Operating Reports under penalty of perjury.  *See* Plaintiff's Exhibits 20-38.  Specifically, section 2(B) of the United States Trustee's Operating Guidelines and reporting Requirements for Chapter 11 Debtors In Possession and Chapter 11 Trustees (the "Chapter 11 Guidelines") provides that Monthly Operating Reports "must include detailed reporting of all financial activity of the bankruptcy estate, including transactions generated by post-petition earnings from personal services, operation of a business, and sales of property of the estate."  *See* Plaintiff's Exhibit 20.  Clearly any sale of his stock in Westmark was required to be disclosed.

With respect to funds the Debtor says he received that were in effect earmarked for Westmark business expenses, such funds would still be considered part of the "financial activity of the bankruptcy estate."  If the Debtor had legitimate Westmark expenses to pay, he could have paid those expenses from his debtor-in-possession account.  In fact, a review of the Debtor's Monthly Operating Reports admitted into evidence reflects that the Debtor disclosed numerous expenses he made for Westmark.  It was not for the Debtor to pick and choose which sources of funds he considered income and disclosed in his reports.  If he had questions, then he should have discussed them with the Office of the United States Trustee as instructed in the Chapter 11 Guidelines.  Creditors and parties in interest are entitled to a complete financial picture of the Debtor's activities and the omissions from the Debtor's Monthly Operating Reports prevented any party from fully understanding the Debtor's activities.

36

Even when the Debtor disclosed certain payments he received, there are either discrepancies between the amounts of several checks in Plaintiff's Exhibit 12 and the corresponding deposits reflected in the Debtor's Monthly Operating Reports, or there are several Monthly Operating Reports for which no corresponding bank statements were attached to confirm the Debtor's activities.  For instance, the Debtor's Monthly Operating Report for April 2008 contains an itemized chart listing the Debtor's debits and credits, but the descriptions of each line item is in handwriting.  An entry dated April 14, 2008 indicates that the Debtor made a counter deposit on April 14, 2008 in the amount of $19,000.00.  *See* Plaintiff's Exhibit 29.  The handwritten description for this entry states: "Westmark Monthly Income."  *See* Plaintiff's Exhibit 29.  When compared with the checks admitted into evidence as Plaintiff's Exhibit 12, there is a copy of a negotiated check dated April 11, 2008 payable to the Debtor from Westmark in the amount of $20,000.00 for "Advance on Commissions."  Assuming the April 11, 2008 check and the April 14, 2008 counter deposit are related, the discrepancy is significant and is one of many.[16]  There are several instances like this where the "counter deposit" reflected in the Debtor's bank statements are significantly less than the amount of the corresponding check in Plaintiff's Exhibit 12.  His Monthly Operating Reports for these months are simply false.  The false and incomplete reports, combined with the Debtor's lack of credibility and cavalier demeanor in explaining the discrepancies, leads the Court to conclude that the Debtor submitted false Monthly Operating Reports to prevent creditors and parties in interest from understanding the true nature of his financial condition.  As for materiality, omissions and discrepancies related to the Debtor's income is most certainly material to the Debtor's bankruptcy case.

---

[16] If the April 11, 2008 check and the April 14, 2008 counter deposit are not related, then the Debtor failed to deposit and account for the entire $20,000.00 payment.

For these reasons, the Court finds that the Plaintiff prevails on Count III of the Complaint and section 727(a)(4) provides an additional basis to deny the Debtor a discharge.

**4.     11 U.S.C. § 727(a)(6)**

Count IV of the Complaint seeks a denial of the Debtor's discharge under section 727(a)(6) based on the Debtor's failure to file a budget as required by the Order Approving Appointment of [Chapter 11] Trustee entered on November 26, 2008 (the "Chapter 11 Trustee Order").

Under 11 U.S.C. § 727(a)(6)(A), a bankruptcy court "shall grant the debtor a discharge unless the debtor has refused to obey any lawful order of the court, other than an order to respond to a material question or to testify."  11 U.S.C. § 727(a)(6)(A).  "The term used in § 727(a)(6)(A) is 'refused' not 'failed.'" *Smith v. Jordan (In re Jordan)*, 521 F.3d 430, 433 (4th Cir. 2008). "Accordingly, the Court must find that the Debtors' lack of compliance with the relevant court order was willful and intentional."  *Id.*  "The party objecting to discharge satisfies this burden by demonstrating the debtor received the order in question and failed to comply with its terms."  *Id.* Such a showing then imposes upon the debtor an obligation to explain his non-compliance.  *Id.*  A debtor's pre-conversion refusal to obey a lawful order of the court may support the denial of discharge under section 727(a)(6).  *See Standiferd v. United States Trustee (In re Standiferd)*, 641 F.3d 1209, 1215 (10th Cir. 2011).

Here, the United States Trustee argues that the Debtor failed to file a budget as required by the Chapter 11 Trustee Order.  It is undisputed that the Debtor received a copy of the Chapter 11 Trustee Order.  *See* Plaintiff's Exhibit 18.  The record of this case is also clear that although the Debtor sent budgetary information to the Trustee, the Debtor never filed the required budget with the Court per the Chapter 11 Trustee Order.  By itself, however, the evidence of the Debtor's

failure to file the budget is insufficient to deny him a discharge under section 727(a)(6), and the denial of his discharge under the preceding sections eliminates the necessity of extensive analysis. Accordingly, the relief sought under Count IV of the Complaint is denied.

**IV.    Conclusion**

For the reasons set forth herein, the Court finds that the Debtor shall be denied his discharge pursuant to 11 U.S.C. § 727(a)(2)(A) for his post-petition transfer of assets of the bankruptcy estate.  Because the Plaintiff need only prove one of the grounds set forth in section 727(a), the Court need not base its decision on the other subsections of 727 litigated by the parties at trial.  Nevertheless, the Court finds additional bases to deny Debtor's discharge exist under sections 727(a)(3) and (a)(4).  A separate Order will issue.


cc:    All Parties
       All Counsel
       Chapter 7 Trustee


**END OF MEMORANDUM**